## ERIKSON v. HAWLEY.

(Court of Appeals of District of Columbia.
Submitted March 1, 1026. Decided
April 5, 1926.)

No. 4329.

**t. Contracts ⟺117(2)—Contract between orthodontist and apprentice held not invalid as in restraint of trade.**

Contract between orthodontist and apprentice, whereby apprentice agreed not to practice orthodontia in the District of Columbia for 10 years after termination of the contract, *held* not invalid as in restraint of trade.

**2. Injunction ⟺189—Injunction restraining orthodontist's breach of restrictive covenant in his apprenticeship contract held not to grant greater protection to other party than was necessary.**

Injunction restraining breach of restrictive covenant in contract between orthodontist and an apprentice *held* not to grant greater relief than was necessary for protection of orthodontist's equitable rights under contract.

Appeal from Supreme Court of District of Columbia.

Suit for injunction by Charles A. Hawley against B. Edwin Erikson. Decree for plaintiff, and defendant appeals. Affirmed.

F. K. Nebecker and D. A. Pine, both of Washington, D. C., for appellant.

W. C. Balderston and W. E. Lester, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, VAN ORSDEL, Associate Justice, and BLAND, Judge of the United States Court of Customs Appeals.

BLAND, Acting Associate Justice. This is an appeal by defendant below, seeking to reverse a judgment in favor of appellee, enjoining appellant, Erikson, from practicing orthodontia within the District of Columbia for a period of 10 years from May 19, 1924, and to compel appellant to keep and perform a certain negative or restrictive covenant, embraced within a written agreement entered into by the parties named, under date of September 2, 1919.

The making of the contract is admitted by the defendant, as well, also, as the fact that he had violated the particular provision thereof which is the subject-matter of this suit. The facts are few and simple, and are not controverted or disputed, since no testimony was offered by appellant in the court below. The learned trial court filed a memorandum of opinion, in which the facts are set out so clearly and orderly as to invite their repetition here in quoted form:

"The term 'orthodontia' indicates a branch of dental science which has for its object the correction of malformation and malposition of teeth, in both children and adults. This particular branch of the profession or science has been practiced for about 30 years. There are now probably not more than 500 orthodontists in the world; of that number there are about 250 or 300 in the United States, some 6 of whom are located in the District of Columbia.

"An orthodontist, individually, can treat, perhaps, 50 cases a year, although, of course, with a competent assistant or assistants more could be treated. The treatment lasts anywhere from one to several years, and the patients, in the main, and as might naturally be expected, are children. The field of operation is not large, and it is considered that one orthodontist can care for the needs of a population of from 100,000 to 150,000 persons.

"It appears from the testimony that there is very little chance for a student to acquire knowledge of the science at a dental school or college; that there are, perhaps, two schools in the United States which give a short term instruction, about six weeks, in the science, but it cannot well be taught in that short time. It takes many years to become a competent orthodontist, and the best way is to become associated, for a number of years, with an orthodontist.

"The principal sources of obtaining patients are (a) by reference from dentists, who do not themselves specialize in that particular line of professional work; and (b) by recommendation of patients who have been treated and are pleased with the result of the treatment. Occasionally a doctor will refer a case.

"The plaintiff enjoys a high reputation in this special branch of dental science, not only locally in this District, but throughout the United States and abroad. The defendant is a graduate of dentistry in one of the local colleges, and, apparently, first came in contact with plaintiff, in 1919, in connection with the examination of defendant for a license to practice dentistry in this District, plaintiff being a member of the board of examiners:

"Prior to entering into the written agreement, the plaintiff and defendant had several conferences, at which were discussed quite fully and in detail the provisions of the only kind of contract the plaintiff would consider, for example, that the term must be for five years; that the employment must be on a salary basis, and not for a share of fees;

that, because of a former experience, plaintiff would not take on an assistant in his office without an agreement not to practice in the District of Columbia for a period of 10 years, although it was stated that plaintiff (at the end of the period mentioned) would be in a position to assist defendant to locate elsewhere. Plaintiff testified that he was 58 years of age when the contract was entered into; that he knew that 10 years was the usual period in such cases, and had been used without question, and that such period fitted in very well with his profession and practice; that he told defendant that the bulk of his practice came from this District, and that outside of this District plaintiff did not care; and, finally, that he thoroughly explained to defendant the 10-year clause.

"To the above defendant assented, stating that the restriction did not interest him, as he was going to Chicago anyway, and had always intended to go there. To this plaintiff responded that the best orthodontist in Chicago was a very warm friend, and that he referred patients to other orthodontists, and that he (plaintiff) had no doubt that, if he talked to such orthodontist, the latter would refer patients to him, the defendant. It may here be noted that defendant told plaintiff that he was 28 years of age, and, further, that, according to statistics, Chicago has a population of some 3,201,000 persons, with but one orthodontist for every 230,000.

"Thus the contract was entered into, and by its terms plaintiff agreed (omitting details) to employ defendant as his associate for a period of five (5) years, and to give him suitable instruction; to pay him a salary of $1,500 for the first year, $1,800 for the second year, $2,100 for the third year, $2,400 for the fourth year, and $2,700 for the fifth year, all payable in installments on the 1st and 15th days of each month; and then came article 7, which is here in question, and which is thus: 'In consideration of the above agreement, the party of the second part agrees not to practice orthodontia in the District of Columbia for a period of 10 years after leaving the services of the party of the first part.' The final paragraph of the contract gave either party the right to terminate the same, with the exception only of the above paragraph 7, upon three months' previous notice.

"The contract thus entered into was kept and performed by each of the parties thereto, and thereafter, February 19, 1924, defendant in writing notified plaintiff of his election to terminate the same at the close of business on the day three months from the date thereof; in either words, on May 19, 1924. Before the expiration of the notice, and under date of April 5, 1924, defendant wrote plaintiff, requesting the waiver of the provisions of the above paragraph 7 of the contract. Failing to secure such waiver, the defendant nevertheless proceeded to determine the matter in his own favor, and accordingly opened an office some two blocks distant from the office of plaintiff, and has ever since engaged, and is still so engaged, in the practice of orthodontia therein. * * *

"Just when it was that defendant reached the conclusion that such provision could not be enforced against him does not appear; but, aside from reasons of preference and convenience, so far as concerns the place of residence of defendant and his family, the following allegations of the answer reflect some useful light: 'That defendant, on account of not having practiced general dentistry, is now unable to pass the required dental examinations in other jurisdictions, and if he is not permitted to practice in the District of Columbia he will be unable to earn a livelihood without spending considerable time in preparation for examinations required in other jurisdictions, and if he removes with his family from the District of Columbia such removal will also result in the loss of employment by his wife. * * * Defendant further alleges that the city of Washington, D. C., offers exceptional opportunities for the practice of orthodontia as compared with other cities similar in size and population; that as defendant is informed and believes, and therefore states the fact to be, there are at the present time in the District of Columbia not more than four practitioners making a specialty of orthodontia.'

"The answer concludes that the bill herein is based wholly upon an alleged breach of a covenant contained in paragraph 7 of the contract, and that said covenant and the whole of said paragraph 7 'is contrary to public policy, harsh and unreasonable in its terms, and null and void.' It thus appears that the only defense to the relief here sought by plaintiff is that, while entered into in good faith and lived up to by plaintiff, defendant should be relieved of performance of one of its most important provisions, so far as plaintiff is concerned, because it is contrary to public policy, harsh and unreasonable in its terms, and therefore null and void."

The bill for injunction, among other things, alleged the following: "This plaintiff further says that, in consequence of the employment of the defendant in accordance with the aforesaid written agreement, the

said defendant became acquainted with the patients of the plaintiff, and that he (defendant) has solicited and continues to solicit the patronage of the said patients for himself; that as a result thereof your plaintiff's practice has been damaged, and will be seriously and irreparably damaged, unless this honorable court by its orders restrains the said defendant from practicing orthodontia in the District of Columbia, and that your plaintiff is without a complete remedy at law, and is therefore compelled to resort to a court of equity for an adequate and complete remedy."

The prayer in the appeal asked that the defendant be restrained by an injunction from practicing orthodontia in the District of Columbia, or holding himself out as such practitioner in said District, or from soliciting, either directly or indirectly, patients or former patients of the plaintiff. At the trial, in the lower court, defendant introduced no evidence and raised but one question, namely, that the contract was contrary to public policy, because in restraint of trade and therefore void.

The learned trial court, as is apparent from the memorandum of opinion, after more than usual consideration of the facts and law involved, granted the prayer of the plaintiff below, and ordered, adjudged, and decreed that plaintiff be restrained and enjoined from practicing orthodontia, and from advertising, or otherwise holding himself out to the public or otherwise, as a practitioner of orthodontia, in the District of Columbia, at any time prior to the 19th day of May, 1934. Upon request of defendant the court suspended operation of the injunction, in so far as defendant was permitted to continue, during the pendency of this appeal, the treatment of 20 patients then being treated by appellant.

Appellant, in this court, makes three contentions: (1) That the restrictive covenant contained in the contract is invalid in so far as it is in restraint of trade; (2) that, assuming the restrictive covenant to be valid, plaintiff has not made out a case entitling him to the relief granted, or to any relief; (3) that the court below erred in granting relief to plaintiff, under said contract, greater than was necessary to protect plaintiff from the particular injury set forth and relied upon in the bill of complaint. We have examined the meager evidence with some care, and we think it supports the allegations of the bill sufficiently, since it was not disputed.

[1, 2] As to the first question raised—that is, the validity of the contract—the court below felt bound to follow the law as stated in Godfrey v. Roessle, 5 App. D. C. 299. Appellant contends that, since this was a contract between a vendor and a vendee, it is not in point with the facts at hand, which involve a contract between employer and employee.

Appellant in an unusually well-prepared brief has cited a great many authorities in an attempt to show that the courts in the more recent decisions have distinguished between restrictive contracts between employers and employees and similar contracts between vendors and vendees. Some of the authorities cited seem to be in point, and it cannot be denied that some very well-considered cases may be singled out from the great mass of authorities on this question which support appellant's contention, among them being Mason v. Provident Clothing Co. [1913], A. C. 724, Ann. Cas. 1914A, 491 (Eng.); Menter Co. v. Brock, 147 Minn. 407, 180 N. W. 553, 20 A. L. R. 857.

While admitting that numerous authorities support the contention that a contract, the restriction of which is limited in space and time, is not invalid, even though applying to employer and employee, appellant argues that the more recent authorities hold that injunctive relief will not be granted an employer against an employee, even where the time and space are both limited, where the question is merely a matter of competition in business between the two, and that the only relief to be granted under these authorities is for unfair and inequitable practices, involving trade secrets, etc. We have examined these authorities with care, and it cannot be denied that some courts have sought to liberalize the general rule, but we do not believe this view is supported by the weight of authority.

While there may be proper distinctions to be drawn between a contract of sale and a contract of employment, which would be controlling in the proper case, we do not think this doctrine, if given the force contended for it, applies or is controlling in the case at bar. In the employment cases, it is urged that the inexperience and dependency of the apprentice puts him in a different position from that occupied by the seller in a sales contract. In some instances this may be true, and courts of equity will not enforce such an agreement, if it would unconscionably bear down upon one who, by reason of his helplessness, was forced into an inequitable position. But we can readily see how the seller in a sales contract might also be in a position equally as helpless as the employee in an employment contract. His ne-

cessities might require him to enter into an unconscionable restrictive agreement of sale, which would be invalid, in the view of appellant, if it had been an apprentice or employment contract, but which would not be valid and enforceable merely because its consideration was money derived from a sale rather than salary.

In the case of Godfrey v. Roessle, supra, the defendant, owning a laundry, had sold it to a corporation, which employed him and in which he held stock. He sold his stock to the plaintiff, and agreed not to "engage under any circumstances in, or be in any way associated with, the management, either in his own name or that of any one else, of any laundry or any laundry business in the District of Columbia." It was alleged Godfrey violated his contract by operating a laundry under the title of the "Godfrey Steam Laundry," which he conducted under his sister's name. An injunction was granted, and the defendant appealed to this court. The testimony did not appear in the record, and the sole question presented was whether or not such a contract was contrary to public policy, and therefore void. In that instance there was no time limit, but the contract was limited to the area of the District of Columbia. Chief Justice Alvey, for the court, said:

"Whether the restraint imposed upon the defendant Ira Godfrey, by the contract, is reasonable or not, can only be determined in the light of the evidence of the case, upon which the court below acted, but which is withheld from this court. If the proof shows, as we must assume it does, that the restraint imposed was not larger or more extensive than was required for the necessary protection of the Swiss Steam Laundry Company, in which the complainant was largely interested as stockholder, then the contract would seem to be valid, according to unquestionable authority. Horner v. Graves, 7 Bing. 743; Rousillon v. Rousillon, 14 Ch. Div. 351; [Oregon Steam] Nav. Co. v. Winsor, 20 Wall. 64, 67 [22 L. Ed. 315]. As said by the Supreme Court, in the case last cited, 'cases must be judged according to their circumstances, and can only be rightly judged when the reason and grounds of the rule are carefully considered.'

"After a party has deliberately made his contract, and received the consideration therefor, it must plainly appear that it contravenes public policy before the courts will declare it void upon that ground; for, as said by the Master of the Rolls, Sir George Jessel, in Printing Co. v. Sampson, L. R. 19 Eq.

Cas., 462: 'It must not be forgotten that we are not to extend arbitrarily those rules which say that a given contract is void, as being against public policy, because if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore we have this paramount public policy to consider— that we are not likely to interfere with this freedom of contract.' *That is but saying that substantial justice and the obligation of contracts are entitled to superior consideration to the vague and indefinite notions of public policy, urged to avoid a contract for which the party has received full consideration. Such a defense always comes with a bad grace from a party to the contract who has received full consideration, and enjoyed the fruits of the contract that he alleges to have been made in contravention of law or principles of public policy.*" (Italics supplied.)

The learned counsel for appellant have very forcefully argued that the Godfrey Case, being a sales case, is not in point, and we infer that they regard this case as not controlling, for the reason that, in the employment contract, the employee is in a more disadvantageous position than the vendor of the stock. This may be or may not be true. From all the record showed in the Godfrey Case, Godfrey may have been a young man in financial distress. He may have been compelled to sell his stock and enter the agreement, or suffer a greater hardship. In both instances, however, by signing the contract the vendor and the employee obtained something that they would not otherwise have obtained. They both received valuable consideration by agreeing not to do a certain thing in the District of Columbia. While, as we said before, there may be points of differentiation between the two classes of contracts, which may, in proper cases, be properly drawn, we cannot see how the law applicable to the case at bar and the Godfrey Case can be materially different.

Where, by restrictive clauses, unconscionable advantages have been taken of dependent employees in their contracts of employment, the courts have always carefully scrutinized them, and have had no hesitancy in declaring them invalid, where the restriction was not limited as to time and territory, and where, by their terms, great hardship was placed upon the employee. Under these cir-

cumstances the courts have almost invariably declared them against public policy, and in some later considered cases restrictive contracts unlimited as to time, and also contracts which were unlimited as to territory; but which were regarded as unconscionable, have been declared invalid.

We think this doctrine rests upon a sound and proper basis, and has not been, and probably will never be, abandoned by the courts; but going hand in hand with this doctrine is a correlative one, to wit, the right to contract and the policy of the courts to see that this right is not unreasonably abridged. So far as we know, this principle has been a dominant one in the affairs of men since the beginning of recorded history. Business relations between citizens, and we might say their general welfare, are so dependent upon the inviolability of this right that it is only in the clearest cases of the inequitable and unconscionable exercise of this privilege that it has been assailed by the courts.

In the case at bar, the appellee, Dr. Hawley, had by his industry and skill made himself an enviable place among his fellow professional men. He was recognized by those who knew him, and knew of him, as being unusually skilled in his profession, a profession, by the way, the success of which largely depended upon the skill, industry, and investigation of the individual. Appellant, when he accepted employment with him and contracted to work at a certain price per year, knew this. He expected to obtain the advantage of the methods, experience, and reputation of his employer. It is obvious that he wanted to learn the business, and, at the time of contracting, it was in the minds of both parties that he should have this advantage; but it was also clearly understood that he would not later, as a competitor of appellee, in the District of Columbia, for 10 years, seek the advantages gained by his acquaintanceship with patrons of appellee. Having obtained the benefits which he sought by the contract, both in salary and in the opportunity of learning the profession, he now seeks to obtain that which was denied him, and which he voluntarily renounced. Manifestly he would not have been employed, if he had not signed the agreement containing the restrictive clause. If such contracts, entered into under such circumstances, were to be held invalid as against public policy, it would seem to us that, aside from the other far-reaching harmful influence that might follow, the direct result of it would be to deny to many young men the opportunity of obtaining what the appellant sought and did obtain in this case. In this the public should be concerned.

Nowhere in this case is there any evidence of bad faith on the part of the employer. No advantage was taken of a young and dependent person. He was of legal age, of good understanding, knew what he wanted, and the contract, as a whole, proved to his great advantage. The doctrine which he now seeks to invoke, in order to violate his agreement and profit by such violation, was not intended to foster wrong, and encourage breach of faith between men in their dealings with each other. Although a wholesome doctrine in a proper case, in a court of equity, where equity and justice require it, it should not be invoked, unless it is clear that the contract in its express terms, and the results that flow from it, are unduly burdensome and inequitable. Limited to 10 years, as it was, and to the narrow confines of the District of Columbia, we cannot but conclude that the restrictive provision was valid.

From a consideration of all the facts, the equities are not with the appellant, and the court below properly found that the appellee was entitled to the full equitable relief prayed for in the bill and granted by the decree. It is very plausibly and earnestly argued, by appellant, that this case is unique, in so far as a contract between the employer and the employee, with reference to the practice of orthodontia, differs from all other contracts of employment considered by the courts, including those of the medical and dental professions. It is contended that, since a patient is treated but once by an orthodontist, there is no reasonable probability of the employee afterwards enticing away or interfering with his employer's clientèle.

The evidence shows that the service rendered to patients by an orthodontist is rarely a necessity, but is in the nature of a luxury, and that it is usually performed upon persons of immature age, and, owing to the expense and length of time required, necessarily is more or less confined to those who are financially well to do. Obviously the employment is usually from or through the parents of the persons treated. Several members of the same family may be treated. The apprentice, having satisfactorily dealt with the parent in the instance of one child, might reasonably expect patronage from the same source as to other dependents, relatives, or friends.

What little evidence there is in the record on the question tends to show that there was at least one patient of appellee who, later, consulted with Dr. Erikson, and the

witness says that he presumed the patient went upon appellant's solicitation. The validity of the contract must be tested by the possibility and probability of damage occurring to appellee, which he sought to guard against in the contract.

Appellant's acquaintance in the city of Washington while in dental school and for nearly five years while with appellee, and his acquaintance with the patrons of appellee, certainly placed him in a position of great advantage in any attempt to entice away a clientèle which would otherwise go to or remain with appellee. Appellant's location within two blocks from the office of appellee, and his efforts to secure a practice, as is disclosed by the record, would seem to us to be an attempt to obtain that which he had contracted against.

No good purpose would be served by an elaborate discussion of authorities. Some of the authorities cited by appellee, within themselves, constitute a digest of most of the important cases, and we will content ourselves with the citation of a few of the leading cases. One of the leading cases is United States v. Addyston Pipe & Steel Co., 85 F. 271, 29 C. C. A. 141, 46 L. R. A. 122, argued before Justices Harlan, Taft, and Lurton. The opinion was delivered by Mr. Justice Taft, which reviewed many cases and discussed the history of the doctrine. In part, the court said:

"* * * 'In such a case the public derives an advantage in the unrestrained choice which such a stipulation gives to the employer of able assistants, and the security it affords that the master will not withhold from the servant instruction in the secrets of his trade, and the communication of his own skill and experience, from the fear of his afterwards having a rival in the same business.' For the reasons given, then, covenants in partial restraint of trade are generally upheld as valid when they are agreements * * * (5) by an assistant, servant, or agent not to compete with his master or employer after the expiration of his time of service * * * the court must find that the restraints attempted thereby are reasonably necessary * * * to protection from the danger of loss to the employer's business caused by the unjust use on the part of the employee of the confidential knowledge acquired in such business."

Supporting the contention of appellee, the following additional authorities are cited: 13 Corpus Juris, § 428; Oregon Steam Navigation Co. v. Winsor, 20 Wall. 64, 22 L. Ed. 315; Harrison v. Glucose Sugar Refining Co., 116 F. 304, 53 C. C. A. 484, 58 L. R. A. 915; Cowan v. Fairbrother, 118 N. C. 406, 24 S. E. 212, 32 L. R. A. 829, 54 Am. St. Rep. 733; Granger v. Craven, 159 Minn. 296, 199 N. W. 10; Davis v. Mason, 5 T. R. 118 (a leading English case); Menter Co. v. Brock, 147 Minn. 407, 180 N. W. 553, annotated in 20 A. L. R. 861.

We conclude that the relief granted by the court below was no greater than that required for the protection of appellee's equitable rights under the contract, and its judgment is affirmed.

Affirmed.